**STATE of Utah, Plaintiff and Appellee,**

v.

**Brian E. HUMPHREY, Defendant
and Appellant.**

No. 960069–CA

Court of Appeals of Utah.

April 10, 1997.

Bradley P. Rich and Hakeem Ishola, Salt Lake City, for Defendant and Appellant.

Jan Graham and Kenneth A. Bronston, Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, BENCH and GREENWOOD, JJ.

## OPINION

WILKINS, Associate Presiding Judge:

Defendant Brian Eugene Humphrey, reserving the right to appeal the denial of his suppression motion, entered conditional guilty pleas to charges of possession with intent to distribute methamphetamine, a second degree felony, in violation of Utah Code Ann. § 58–37–8(1)(a)(ii) (Supp.1996), and possession of a dangerous weapon by a restricted person, a third degree felony, in violation of Utah Code Ann. § 76–10–503 (1996). On appeal, defendant challenges the trial court's denial of his motion to suppress evidence. We affirm.

## BACKGROUND

"In reviewing the trial court's ruling, we recite the facts in the light most favorable to the trial court's findings." *State v. Anderson,* 910 P.2d 1229, 1230 (Utah 1996).

In January 1995, Utah Highway Patrol Trooper Ken Collier stopped a red Pontiac Fiero traveling north on State Road 191, just south of Monticello, Utah. Later that same day, Trooper Collier reported the stop to Trooper Andy Peterson. Trooper Rick Eldredge overheard Trooper Collier explain that he had stopped the car because it had no front license plate. Trooper Collier identified the driver of the Fiero as Nicki Peterson, Trooper Peterson's daughter. He also reported that she was accompanied by an adult male passenger, defendant, who appeared "very, very nervous and scared." When asked for identification, defendant's shaking caused him to drop or nearly drop his driver's license.

During the course of the traffic stop, Trooper Collier requested permission from Nicki to search the car; she consented. However, before the Trooper could conduct the search, the male passenger "yelled at the driver" and told her not to consent. Nicki then revoked consent for the search. Trooper Collier, recognizing her right to refuse consent, issued a warning ticket for the front license plate violation and allowed the couple to proceed.

Shortly thereafter, Trooper Peterson spoke in person to Trooper Eldredge. Trooper Peterson identified the female driver of the Fiero as his daughter, Nicki, and related some personal family history. Trooper Peterson reported that Nicki had been using methamphetamine for about one year; that he had conversations with her when she "was so high he couldn't even understand her"; and that based upon his observations, he felt Nicki was using drugs heavily. Trooper Peterson also told Trooper Eldredge that Nicki had recently been "involved" with a man who was later jailed for drug crimes. Nicki also had admitted to her father that, in the past, she had transported drugs from Arizona to Colorado. At this point, Trooper Eldredge relayed the fact that he had seen the red Fiero two or three days earlier traveling south near Blanding, Utah, towards Arizona. Because the Fiero was heading north when Trooper Collier stopped it, Trooper Peterson suspected Nicki was transporting drugs from Arizona to Colorado.

Shortly after his conversation with Trooper Peterson, Trooper Eldredge contacted Trooper Collier by radio to confirm the information. Trooper Eldredge later set out to find the Fiero. In the meantime, Trooper Eldredge contacted his superior by radio to inquire about securing a warrant to search both the Fiero and its occupants for drugs. Before receiving a reply from his superior about the availability of a search warrant, Trooper Eldredge, driving south, encountered the red Fiero traveling north, about twenty miles outside Monticello, Utah. Trooper Eldredge testified that the Fiero was traveling sixty miles per hour and that the car was without a front license plate. As he turned to follow, he also noticed that the Fiero's taillights were obscured. Despite the obvious traffic violations, Trooper Eldredge testified that he stopped the Fiero because he suspected the occupants were transporting controlled substances.

When Trooper Eldredge stopped the car, defendant was driving. Defendant presented a driver's license in the name of Brad Davis. Trooper Eldredge asked Nicki to leave the car and talk with him privately at the rear of the vehicle; she complied. Trooper Eldredge noted a problem with the taillights, and Nicki got a cloth from the car to clean them. Because it was cold and Nicki did not have a jacket or coat, Trooper Eldredge invited Nicki into the patrol car to talk while he ran a routine check on both occupants for warrants, valid driver's licenses, and possible criminal histories. She joined him in the patrol car, but was "very nervous" and "fidgety."

Trooper Eldredge thought Nicki's nervous behavior was odd, in light of the fact he was well acquainted with Nicki and her family. Trooper Eldredge had been in the Peterson home on more than one occasion in an ecclesiastical capacity, and his wife had been Nicki's teacher in school. As a result of this familiarity, Trooper Eldredge was surprised that Nicki was so nervous in his presence. When asked, she stated that she is always nervous around cops, despite the fact her father is a trooper.

Trooper Eldredge asked Nicki if she had any controlled substances in her car. She

said no. He then asked if he could look in the car; she asked if he had a warrant. Trooper Eldredge said that he did not, but he was trying to obtain one. During this conversation in the patrol car, Trooper Eldredge was notified that there were no outstanding warrants on the vehicle's occupants, nor was there anything justifying further action or detention as a result of the license and criminal history checks. He was also informed that his superior felt there was insufficient evidence to support a search warrant, but that a drug dog could be brought to the scene. At this point, approximately seven minutes had elapsed since the stop began.

Trooper Eldredge left the patrol car to talk with defendant. Nicki followed and stood at the rear of the car. As Trooper Eldredge began talking with defendant, Nicki said she was cold and wanted a coat. Defendant offered his jacket and passed it to Trooper Eldredge to hand to Nicki. After defendant handed him the coat, Trooper Eldredge quickly patted the coat down and discovered a "large bulky item" inside one of the pockets. Thinking it could be a revolver, he checked the pocket and instead found a glass bottle of injectable xylocaine, a controlled substance, bearing the label, "Federal law prohibits dispensing without a prescription."

Trooper Eldredge separately questioned Nicki and defendant about the xylocaine. Each offered a different explanation—Nicki claimed the xylocaine belonged to their friend who had cancer; defendant claimed he had found it in an alley. The trooper then administered field sobriety tests to defendant, and ultimately arrested him for driving under the influence of a stimulant believed to be methamphetamine. After the arrest, officers ultimately discovered nearly a pound of methamphetamine, a small amount of marijuana, some drug paraphernalia, a nine millimeter pistol, and four or five more bottles of injectable xylocaine in the vehicle.

As a result, defendant was charged in a ten-count information with a variety of crimes. Defendant filed a motion to sup-

press the evidence obtained from the search of both defendant's coat and the car. Following the suppression hearing, the court denied defendant's motion. Defendant entered conditional guilty pleas[1] to charges of possession with intent to distribute methamphetamine, a second degree felony, in violation of Utah Code Ann. § 58–37–8(1)(a)(ii) (Supp.1996), and possession of a dangerous weapon by a restricted person, a third degree felony, in violation of Utah Code Ann. § 76–10–503 (1995). In exchange, the State dismissed all other counts. Defendant was sentenced to serve one-to-fifteen years for the drug conviction, and zero-to-five years for the firearm conviction, the sentences to run concurrently.

## ISSUES AND STANDARD OF REVIEW

■ Defendant challenges the trial court's order, denying his motion to suppress, claiming the evidence against him was obtained in violation of both the Utah and the United States Constitutions. Because defendant fails to explain how this court's analysis of the state constitution should differ from the federal constitution, we decline to separately address the Utah constitutional challenge. *See State v. Roth,* 827 P.2d 255, 257 n. 1 (Utah Ct.App.1992).

■ Defendant asserts the trial court erred in determining Trooper Eldredge had reasonable articulable suspicion either to justify the initial stop of the vehicle he was driving or to expand the scope of the traffic stop. A trial court's determination of reasonable articulable suspicion is a conclusion of law, reviewed for correctness. *See State v. Nguyen,* 878 P.2d 1183, 1185 (Utah Ct. App.1994). Thus, we need not defer to the trial court's determination. *See id.; see also State v. Pena,* 869 P.2d 932, 939 (Utah 1994). Appellate courts, however, afford the trial judge "a measure of discretion" in applying the reasonable articulable suspicion standard to a particular set of facts. *Pena,* 869 P.2d at 939. Because of the trial court's advantageous position in determining the factual ba-

---

1. *See State v. Sery,* 758 P.2d 935, 939 (Utah Ct.App.1988) (upholding use of conditional pleas).

sis for a motion to suppress, *see State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987), the underlying findings of fact are reviewed for clear error. *See State v. Anderson,* 910 P.2d 1229, 1232 (Utah 1996). Findings of fact are clearly erroneous only if they are not adequately supported by the record. *See id.*

## ANALYSIS

■ The Fourth Amendment protection from unreasonable searches and seizures applies to investigatory stops of vehicles, regardless of the reason for the stop or the brevity of the detention. *See Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "To determine whether a search or seizure is constitutionally reasonable, we make a dual inquiry: (1) Was the police officer's action 'justified at its inception'? and (2) Was the resulting detention 'reasonably related in scope to the circumstances that justified the interference in the first place?'" *State v. Lopez,* 873 P.2d 1127, 1131–32 (Utah 1994) (quoting *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

In reaching our decision in this case, we focus on two questions. First, did Trooper Eldredge have a legally sufficient reason to stop the vehicle defendant was driving? Second, if the stop was legally justified, was it limited in scope to the circumstances justifying the interference?

### I. The Stop

■ Under the Fourth Amendment, a police officer is justified in stopping a vehicle when the officer observes the driver commit a traffic violation, or when the officer has a reasonable articulable suspicion that the driver committed or is about to commit a crime, such as transporting drugs. *See Lopez,* 873 P.2d at 1132; *State v. Bello,* 871 P.2d 584, 586 (Utah Ct.App.1994); *State v. Smith,* 781 P.2d 879, 882 (Utah Ct.App.1989).

■ Our inquiry focuses on whether Trooper Eldredge had a reasonable articulable suspicion that the vehicle's occupants were involved in illegally transporting drugs. Because we hold that he did, we do not address the issue of whether Trooper El-

dredge was justified in stopping the vehicle based on the observed traffic violations.

■ The concept of reasonable articulable suspicion is not self-defining. Therefore, courts look to the totality of the circumstances present at the time of the stop to determine if there was an objective basis for suspecting criminal activity. *See Nguyen,* 878 P.2d at 1186; *see also Terry,* 392 U.S. at 21, 88 S.Ct. at 1880 (holding stop justified if police officer sees unusual conduct which leads officer to reasonably conclude in light of officer's experience that criminal activity may be afoot). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture.'" *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)) (stating tip with low degree of reliability requires more information to establish requisite quantum of suspicion than more reliable tip). Reasonable suspicion is based on objective facts, *see Nguyen,* 878 P.2d at 1186, which are given due weight in light of the reliability of the information, *see White,* 496 U.S. at 330, 110 S.Ct. at 2416, and the reasonable inferences drawn from those facts, *see State v. Roth,* 827 P.2d 255, 257 (Utah Ct.App.1992).

Defendant asserts the information Trooper Eldredge relied upon was insufficient to establish reasonable suspicion because the information was obtained through an unreliable tip and it was consistent with innocent behavior. We disagree. Trooper Eldredge relied upon specific articulable facts obtained through the personal observations of Trooper Collier during the first stop, and the personal observations and knowledge of Trooper Peterson, who provided adverse information about his daughter, an occupant of the vehicle.

■ The specific articulable facts required to support reasonable suspicion are based, most frequently, on an officer's own observations and inferences. *See State v.*

*Case,* 884 P.2d 1274, 1276–77 (Utah.Ct.App. 1994); *see, e.g., Terry,* 392 U.S. at 22–23, 88 S.Ct. at 1880–81. However, an officer may also rely on other sources of information. *See Case,* 884 P.2d at 1277. In *Case,* this court recognized "[a]n investigative stop *may* survive the Fourth Amendment prohibition of unreasonable searches and seizures if performed by an officer who objectively relies on information, bulletins, or flyers received from other law enforcement sources." *Id.* (emphasis in original). In addition, the Supreme Court has recognized that an officer may rely upon the observations of fellow officers engaged in a common investigation. *See United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) (recognizing observations of fellow officers form reliable basis to determine probable cause to arrest).

In this case, Trooper Eldredge was justified in relying on the information provided by Troopers Collier and Peterson. Trooper Collier's personal observations of defendant's nervous behavior during the stop and his anger regarding a possible search are clearly reliable. In addition, the adverse information about Nicki, provided by her father Trooper Peterson, was also reliable and akin to a "tip." Defendant challenges Trooper Eldredge's reliance on this information as an "uncorroborated tip," lacking both credibility and reliability. However, this case substantially differs from the common anonymous tip or known informant scenarios, where the source's credibility or the reliability of the information is either unknown or questioned. In this case, all the indicia of reliability are present. Trooper Peterson's credibility is unquestioned. He is an experienced police officer, with whom Trooper Eldredge worked, and, as such, the information Trooper Eldredge received from Trooper Peterson and relied upon in making the drug stop was provided by a *known source* of *known reliability. See People v. Petralia,* 62 N.Y.2d 47, 476 N.Y.S.2d 56, 58, 464 N.E.2d 424, 426 (1984) (holding officer had probable cause to

arrest based on information from another officer who personally witnessed criminal activity). In addition, because Trooper Peterson was Nicki's father, the basis of his knowledge of Nicki's drug use and admitted drug trafficking is well established. *See State v. Potter,* 860 P.2d 952, 957 (Utah.Ct.App.1993) ("The basis of [a known informant's] knowledge is proper since it was allegedly based on personal observation.").

Based on the observations of Troopers Collier, Peterson, and Eldredge, the trial court found that: (1) Trooper Eldredge saw the red Fiero, driven by Nicki with defendant, heading south toward Phoenix, a major drug supply location, two to three days before the stop; (2) Trooper Collier had told Trooper Eldredge that the occupants of the red Fiero were traveling north from the direction of Phoenix, the day of the stop; (3) earlier in the day, when Trooper Collier stopped the Fiero for a minor traffic violation, defendant acted extremely nervous and became angry about a possible search of the car; (4) a trained and experienced trooper, Nicki's father, reported that Nicki was a serious drug user; and (5) she had admitted to transporting drugs from Phoenix, Arizona to Grand Junction, Colorado.[2] Based on these findings, and the reasonable inferences drawn therefrom, the trial court concluded that reasonable articulable suspicion existed.

In reviewing the totality of the circumstances present at the time of the stop, we consider both the content of the information and its reliability. In light of Trooper Collier's and Trooper Peterson's established reliability and credibility and the information provided through their personal observations, the totality of the circumstances establish that Trooper Eldredge had objective facts to support his suspicion that the occupants of the Fiero were in the act of illegally transporting drugs.

Defendant, however, challenges whether this articulated suspicion was "reasonable," claiming that the factors the trial

---

**2.** Defendant did not challenge any of the trial court's factual findings, except those relating to the traffic stop, i.e., the finding that defendant was speeding, and that the vehicle's taillight was obscured. However, because these findings re-

late specifically to the traffic stop and are not included in our analysis regarding the drug stop, these challenged facts do not affect the result, and we need not address them.

court relied upon are "not peculiar to criminal activity." We acknowledge that traveling at what may seem a suspicious time in a suspicious location alone is insufficient to establish reasonable suspicion. *See State v. Steward,* 806 P.2d 213, 216 (Utah Ct.App. 1991) (holding no reasonable suspicion where only indicia of criminal activity was truck driving on public road late at night); *State v. Trujillo,* 739 P.2d 85, 89 (Utah Ct.App.1987) (holding late hour, high crime area, and nervous behavior insufficient to form reasonable suspicion). Nervous behavior in the presence of police officers, alone, is also not enough. *See Potter,* 860 P.2d at 957; *State v. Lovegren,* 829 P.2d 155, 158 (Utah Ct.App. 1992). In addition, the fact an individual previously has been involved in criminal activity is also not enough. We recognize that consideration of an individual's past criminal history is not properly part of the probable cause determination. *See State v. Brooks,* 849 P.2d 640, 644 (Utah Ct.App.1993) (stating information that defendant had been target of past drug investigations not considered in determining *probable cause* of current possession of controlled substances). However, information regarding an individual's past, and in this case ongoing, criminal activity can be a factor in determining reasonable suspicion. *See United States v. Chamberlin,* 644 F.2d 1262, 1265 (9th Cir.1980) (considering officer's personal knowledge of person's past criminal activities factor justifying officer's reasonable suspicion).

The trial court recognized that some of the factors supporting reasonable suspicion in this case are consistent with innocent behavior and acknowledged the stated limitations on determining the existence of reasonable suspicion. However, reviewing all the factors collectively, the court concluded that Trooper Eldredge's articulated suspicion was reasonable. We agree. Alone, each of the factors previously discussed—past criminal activity, nervousness, anger, and traveling back from a known drug community—cannot support reasonable suspicion. However, combined, under the facts of this case, they justify a reasonable suspicion of criminal activity sufficient to warrant an investigatory stop and detention to either confirm or dispel the suspicion. Because Trooper Eldredge could articulate sufficient facts that would lead a reasonable person to conclude that the occupants of the red Fiero were involved in transporting illegal drugs, the stop was justified at its inception as required by the Fourth Amendment.

## II. The Scope of the Drug Stop

█ Trooper Eldredge had reasonable suspicion to stop defendant's vehicle and investigate for drugs. However, the detention resulting from the stop must be reasonably related in scope to the circumstances that justified the stop in the first place. *See Terry,* 392 U.S. at 21, 88 S.Ct. at 1880; *see also United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985) (discussing factors courts should consider in determining "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"). In this case, Trooper Eldredge stopped the vehicle to investigate his suspicion that the occupants were transporting drugs. Within the first seven or eight minutes of the encounter, the trooper questioned Nicki, completed the computer checks on both defendant and Nicki, and had returned to the car to question defendant. Within the course of the investigation, but before Trooper Eldredge could question defendant regarding drugs, defendant voluntarily handed his jacket to the trooper. The trooper, suspecting the commission of a serious crime, legally patted down the jacket for weapons. *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85 (1968) (allowing patdown search of outer clothing to check for dangerous weapons); *State v. Dorsey,* 731 P.2d 1085, 1092 (Utah 1986) (Zimmerman, J., concurring) (acknowledging officer could reasonably assume individuals suspected of participating in moving large quantities of illegal drugs over long distances may be armed). In doing so, he discovered illegal drugs, providing probable cause for defendant's arrest. We hold the detention, beginning from the stop to the discovery of the xylocaine, was reasonably related to the drug investigation and limited in scope to confirm quickly the arresting officer's suspicion. Therefore, the

resulting search and seizure was reasonable under the Fourth Amendment.

## CONCLUSION

We conclude defendant's Fourth Amendment right to be free from unreasonable searches and seizures was not violated. Because Trooper Eldredge had a reasonable articulable suspicion to stop the vehicle, and because the detention was reasonably related to the drug investigation, the evidence subsequently gathered need not be excluded. Affirmed.

BENCH, J., concur.

GREENWOOD, Judge (dissenting):

I respectfully dissent from my colleagues' opinion concluding that the stop of the vehicle in which defendant was a passenger was justified by reasonable suspicion of illegal drug activity.

I agree with the trial court that Trooper Eldredge's initial stop of the Fiero was legally justified. A traffic stop based on even a minor traffic violation is justified, regardless of the officer's motivations or suspicions which are unrelated to the traffic offense. *See State v. Lopez*, 873 P.2d 1127, 1135 (Utah 1994). Nevertheless, the detention following a routine traffic stop is generally limited to examining the driver's license and vehicle registration, conducting a computer check, and issuing a citation. *See, e.g., State v. Robinson*, 797 P.2d 431, 435 (Utah Ct.App. 1990). "Unsupported by further probable cause or reasonable suspicion, inquiries by the officer to investigate suspicions unrelated to the traffic offense unconstitutionally extend the detention beyond the scope of the circumstances that rendered it permissible." *Lopez*, 873 P.2d at 1135.

In this case, Trooper Eldredge legally stopped the Fiero due to the missing front plate and the obscured taillights. However, once Trooper Eldredge determined that defendant had a valid driver's license, completed the computer check, and otherwise fulfilled the purpose of the traffic stop, he should have allowed defendant and Nicki to proceed on their way without any further detention or questioning. *See Robinson*, 797 P.2d at 435; *State v. Castner*, 825 P.2d 699, 703 (Utah Ct.App.1992). Instead, Trooper Eldredge improperly expanded the stop's scope to question defendant about drug-related activity, which led to the pat-down search of defendant's coat and the subsequent discovery of drugs.

I disagree with the majority that reasonable articulable suspicion to investigate for drug activity supported Trooper Eldredge's initial stop.[1] To justify an investigatory stop of a vehicle, an officer must have reasonable articulable suspicion that the vehicle's occupants are, at that moment, engaged in criminal activity. *See Lopez*, 873 P.2d at 1132. The majority identifies five factors it contends establish reasonable suspicion of present drug activity in this case.

Factors four and five—Trooper Peterson's information that Nicki was a drug user and that she had previously admitted to transporting drugs from Phoenix to Grand Junction—are the only factors relating to criminal activity. However, this information does not indicate that Nicki was transporting drugs *at the specific time she was stopped. See State v. Potter*, 860 P.2d 952, 956 (Utah Ct.App. 1993) (refusing to consider fact that suspect was under ongoing investigation for drug distribution in determining whether police had probable cause to search for drugs); *State v. Brooks*, 849 P.2d 640, 644 (Utah Ct.App.1993) (refusing to consider facts that suspect had been investigated for drug activity and had been previously convicted of drug crimes when considering probable cause to search for drugs).[2] Furthermore, this infor-

---

1. As the majority apparently concedes, nothing happened from the time of the initial traffic stop to the time the computer check was completed to increase the reasonable suspicion present at the time of the initial stop. Having been stopped for the second time within hours for the license plate violation, the nervousness displayed by Nicki as Trooper Eldredge interrogated her about transporting drugs simply does not justify further de-

tention. *See State v. Godina–Luna*, 826 P.2d 652, 655 (Utah Ct.App.1992).

2. Although the analyses for reasonable suspicion and probable cause determinations differ in terms of the degree of suspicion necessary to establish each one, the analyses are analogous in terms of what types of evidence establish suspi-

mation is accorded especially little weight considering its vague nature. The record does not reflect that Trooper Peterson indicated exactly when Nicki had transported drugs in the past, nor did he say that she had ever transported drugs in her own car.[3] *Cf. Brooks,* 849 P.2d at 644 (noting that evidence of prior drug convictions and being subject of prior drug investigation are due little weight "especially" in light of facts that criminal record was approximately two years old and last event relating to prior drug investigation occurred nine months prior to search, when suspect living at different address).

The remaining factors considered by the majority are consistent with innocent behavior and are not, either singly or in the aggregate, strongly indicative of transporting drugs. *Cf. Provo City Corp. v. Spotts,* 861 P.2d 437, 440 (Utah Ct.App.1993) ("[W]here a defendant's conduct is 'conceivably consistent with innocent ... activity,' but is also '*strongly indicative*' of criminal activity, we will not hesitate to conclude that reasonable suspicion exists." (emphasis added) (citation omitted)). Many people travel to and from Phoenix. Moreover, even assuming traveling to and from Phoenix is indicative of drug activity, there is no evidence that Nicki traveled to or was returning from Phoenix on the day of the stop. She could have been traveling to or from any number of destinations, for any number of reasons. *Cf. State v. Sery,* 758 P.2d 935, 945 (Utah Ct.App.1988) (noting negligible probative value of vague itinerary evidence which did not indicate specific cities where suspect had been).

Similarly, defendant's nervousness and angered admonishment that Nicki refuse consent to search during the first stop provides little support for reasonable suspicion of criminal activity. *Cf., e.g., United States v. Manuel,* 992 F.2d 272, 274 (10th Cir.1993) ("[T]he exercise of a right to refuse consent alone cannot be the basis of reasonable suspicion."); *Potter,* 860 P.2d at 957 (noting that nervous behavior alone does not establish reasonable suspicion of criminal activity). Indeed, defendant's reaction could just as easily be attributed to indignation that an officer would request consent to search the car after having pulled the pair over for the minor violation of not having a front license plate attached.

In my opinion, the State has not met its burden of demonstrating Trooper Eldredge's suspicions that Nicki and defendant were transporting drugs were based on reasonable articulable facts. I would therefore reverse the trial court's denial of defendant's motion to suppress and accordingly reverse defendant's conviction.

---

cion. *See, e.g., State v. Contrel,* 886 P.2d 107, 110 (Utah Ct.App.1994).

**3.** During direct examination, Trooper Eldredge stated he did not remember what Trooper Peterson had said with regard to how long it had been since Nicki had transported drugs. On cross-examination, Trooper Eldredge indicated he thought it may have been a couple of months prior to the day of the stop. Any suggestion that Trooper Eldredge relayed more specific information with regard to the prior instances of Nicki transporting drugs is not supported by the record.